IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

HARDI NORTH AMERICA, INC.                                PLAINTIFF

v                                              CIVIL ACTION NO.: 4:18-cv-83-JMV

CHARLES JOSEPH SCHINDLER, II, *ET AL.*                    DEFENDANTS

**ORDER**

This matter is before the Court on plaintiff Hardi North America Inc.'s (hereinafter "Hardi" or "supplier") motion for summary judgment[1] against Delta Southern Chemical Company, LLC for a lump sum judgment in the amount of $1,471,742.98 together with attorney's fees and interest at $439.06 per day from and after September 1, 2018, through the date of judgment, as well as post-judgment interest and costs. For the reasons discussed below the motion will be GRANTED in part and DENIED in part.

*Background*

In or around June 2017, Hardi, a farm equipment manufacturer, entered into a Dealer Agreement with Delta Southern Chemical LLC, hereinafter referred to as "dealer or retailer," to facilitate the continued[2] retail sale of Hardi manufactured agricultural sprayers from the dealer's Clarksdale, Mississippi facility.

According to the relevant portions of the Dealer Agreement, which was in force for a period of three (3) years from the Effective Date of June 9, 2017 unless sooner cancelled:

> HARDI may terminate this Agreement at any time upon the occurrence of a Good Cause Event… a Good Cause Event shall mean any one or more of the following:…

---

[1] This is, in fact, a motion for only partial summary judgment, as the complaint seeks relief not advocated for in the instant motion.
[2] It appears from business records produced by Hardi that its relationship with the dealer began at least as early as April 2016.

> Dealer defaults under any chattel mortgage or other security agreement with HARDI or floor plan provider... Hardi does not sale on consignment. Any and all inventory available to DEALER must be invoiced to the DEALER for the DEALER to be able to utilize it.… All self-propelled sprayers sold and delivered to a retail customer are due and payable immediately. Settlement must be paid to HARDI within 24 hours after delivery… In the event of cancellation, all machines and parts which are in new, current and salable condition may be returned to HARDI subject to a restocking charge and subject to state legislative buy-back laws where dealership resides and where applicable.

Doc. #1-1 at 3.

Further, a security agreement executed by the dealer in conjunction with the Dealer Agreement provides, in relevant part:

> [Dealer] grants to Hardi… a security interest in… All inventory of new and used farm and industrial goods,… which is manufactured and/or distributed by Secured Party …[T]o secure payment of the indebtedness evidenced by this Agreement, and also any and all liabilities… hereafter arising … Debtor agrees to pay Secured Party in accordance with the terms as prescribed by Hardi North America, Inc. invoices, and to pay service charges from the past due date on unpaid balances at the highest legal rate and maturing, and to pay on demand reasonable cost of collection, including reasonable attorney's fees.… The collateral will be kept at Clarksdale, MS… Debtor will keep the collateral free from any adverse lien,… and in good order and repair and will not waste or destroy the Collateral or any part thereof… Until default Debtor may have possession of the Collateral and use it in any lawful manner not inconsistent with this Agreement… Debtor shall be in default under this Agreement upon the happening of… Default in the payment or performance of any obligation contained or referred to herein… Upon such default and at any time therefore Secured Party may decline (sic) all Obligations secured hereby immediately due and payable and shall have the remedies of a Secured Party under the Uniform Commercial Code.

Doc. #1-2 at 1-2.

*Standard and Governing Law*

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.; see also Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 876 F.3d 119, 128 (5th Cir. 2017). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). In determining whether there are genuine disputes of material fact, the Court "must 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment. *Abarca v. Metro. Transit Auth.,* 404 F.3d 938, 940 (5th Cir.2005) (citing *Coleman v. Houston Indep. Sch. Dist.,* 113 F.3d 528, 533 (5th Cir.1997)).

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Unida v. Levi Strauss & Co.,* 986 F.2d 970, 976 (5th Cir.1993); *Chrisman Mfg., Inc. v. Rowan-Cornil, Inc.*, 859 F. Supp. 2d 842, 845 (S.D. Miss. 2012). A party seeking summary judgment bears the initial burden of identifying those portions of the pleadings and discovery, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The burden then shifts to the nonmovant to show that summary judgment should not be granted. *Id.* at 324–25, 106 S.Ct. 2548. To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that there exists a genuine issue of material fact. *Hamilton v. Segue Software, Inc.,* 232 F.3d 473, 477 (5th Cir.2000) (citing *Conkling v. Turner,* 18 F.3d 1285, 1295 (5th Cir.1994)).

*Discussion*

The Dealer Agreement's reference to state buyback laws is, in the State of Mississippi, a reference to, as noted above, those laws codified at Miss. Code. Ann. § 75-77-1 through Miss. Code. Ann. § 75-77-19. In relevant part, those statutes provide:

> Repurchase of Inventory by Supplier. Whenever any retailer [meaning any person engaged in the business of selling farm implements…] enters into an agreement, evidenced by a written or oral contract, with a supplier wherein the retailer agrees to maintain an inventory of parts and to provide service and the contract is terminated, then the supplier shall repurchase the inventory as provided in this chapter. The retailer may keep the inventory if he desires. If the retailer has any outstanding debts to the supplier, then the repurchase amount may be setoff or credited to the retailer's account. Miss. Code. Ann. § 75-77-3 (West).

> Repurchase Price. The supplier shall repurchase inventory previously purchased from him and held by the retailer on the date of termination of the contract… [at] one hundred percent (100%) of the current net price of all new, unsold, undamaged and complete farm implements… and… ninety percent (90%) of the current net price on new, unused and undamaged and superseded repair parts… [E]quipment leased primarily for demonstration or lease, shall also be subject to repurchase under this law at its agreed depreciated value, provided such equipment is in new condition and has not been abused. Miss. Code. Ann. § 75-77-5 (West).

> Transfer of Title and Right of Possession. Upon payment of the repurchased amount to the retailer, the title and right of possession to the repurchased inventory shall transfer to the supplier… Miss. Code. Ann. § 75-77-7 (West).

> Exempt Items. The provisions of this chapter shall not require the repurchase from a retailer of: … Any farm… equipment… which are not current models, or which are not in new, unused, undamaged, complete condition, provided that the equipment used in demonstrations or leased as provided in Section 75-77-5 shall be considered new and unused… Miss. Code. Ann. § 75-77-9 (West).

> Liability for Failure or Refusal to Repurchase. If any supplier shall fail or refuse to repurchase and pay the retailer for any inventory covered under the provisions of this chapter within sixty (60) days after shipment of such inventory, he shall be civilly liable for one hundred percent (100%) of the current net price[3] of the inventory, plus any freight charges paid by the retailer, the retailer's attorney's fees, and court costs and interest on the current net price computed at the legal interest rate from the sixty-first day after the date of shipment. Miss. Code. Ann. § 75-77-11 (West).

---

[3] Current net price is defined in Miss. Code. Ann. § 75-77-1(b) as "the price listed in the supplier's price list or catalogue in effect at the time the contract is cancelled or discontinued less any applicable trade and cash discounts…"

4

Security Interest in Inventory Unaffected. The provisions of this chapter shall not be construed to affect in any way any security interest with which the supplier may have in the inventory of the retailer… Miss. Code. Ann. § 75-77-15 (West).

Affected Contracts. Any contractual term restricting the procedural or substantive rights of a retailer under this chapter, including a choice of law or choice of forum clause, is void. Miss. Code. Ann. § 75-77-17 (West).

Finally, of relevance here, is the established right of secured creditors in Mississippi, at their election, to pursue a monetary judgment in advance of exercising rights against collateral securing the indebtedness. *See,* Miss. Code. Ann. § 75-9-601(c); *Competition Marine of MS, Inc. v. Whitney Bank*, 220 So. 3d 1019, 1023 (Miss. Ct. App. 2017)(citing *Knight Properties, Inc. v. State Bank & Tr. Co.*, 77 So. 3d 491, 494–95 (Miss. Ct. App. 2011)).

*Facts and Analysis*

Following execution of the Dealer Agreement, Hardi invoiced the dealer, insofar as the instant motion is concerned, for an aggregate of six agricultural sprayers. Each sprayer[4], including relevant events occurring subsequent to the sale, is discussed below followed by the court's finding regarding entry of summary judgment related to that sprayer.

*Sprayer Number 6100*

On May 17, 2017, Hardi issued invoice number 76963 to the dealer pertaining to sprayer (6100) in the amount of $323,796.00. A copy of this invoice was not provided by Hardi in support of its motion for summary judgment. However, according to records provided by Hardi, it appears that on June 13, 2017 the dealer's indebtedness to Hardi for this sum was satisfied or cancelled, but simultaneously therewith Hardi re-invoiced this sprayer to the dealer under subsequent invoice number 79460, in the same amount—$323,796.00. Doc. #58-1 at 17.

---

[4] Each sprayer will be referenced by the last four (4) digits of the serial number assigned to the sprayer.

According to this re-issued invoice, a copy of which was provided the court, the sales price of sprayer (6100) was $404,745.00 but was reduced to $323,796.00 as a result of a twenty percent (20%), or $80,949.00, trade discount. *Id.* Payment terms on the invoice are described only as "original" payment terms. At or about this same time, the dealer received financing from Wells Fargo, pursuant to an Inventory Financing Agreement, dated May 25, 2016, and then satisfied the $323,796.00 indebtedness owed to Hardi for the sprayer. Doc. #75-3 at 19.

Shortly after Wells Fargo financed the purchase by the dealer of sprayer (6100), but apparently unbeknownst to Wells Fargo, the dealer, according to Hardi's counsel, "purported" to sell sprayer (6100) to Farm Credit Leasing Corporation but did not pay Wells Fargo from the sale proceeds. Doc. # 89 at 5. In any event, on February 14, 2018, Well Fargo notified the dealer that it was terminating the Inventory Financing Agreement due to, among other matters, the dealer having moved unspecified collateral to a non-permitted location. Doc. #75-3 at 23. As a consequence of the default, Wells Fargo, at that time, accelerated all indebtedness owed it and demanded of the dealer the entire unpaid balance for what, at that time, amounted to three unpaid invoices,[5] reflecting what Wells Fargo alleged was an aggregate indebtedness of $809,275.00.[6]

Though no agreement evidencing the same has been provided, according to Hardi, it is contractually obligated to Wells Fargo to satisfy the indebtedness owed Wells Fargo by the dealer. Doc. #89 at 4. Further, on May 31, 2018, after the instant lawsuit was filed, and after Wells Fargo had filed suit against Charlotte Schindler on her guarantee of the dealer's indebtedness to Wells

---

[5] The court also notes that although the principal owed to Wells Fargo—$323,796.00—by the dealer was subject to a "Free Period"[5] until March 10, 2018, the same invoice recites "CHARGES BEGIN DATE: 06/14/17" at the rates described in the Wells Fargo invoice. *Id.*

[6] This amount represents the principal owed on each of a collective three (3) invoices from Wells Fargo to the dealer in the following principal amounts: (6100) - $323,796.00; (5543) - $177,000.00; and (4164) - $242,232.00. When the Wells Fargo Inventory Financing Agreement was terminated, and payment accelerated, no interest had apparently accrued under these invoices. Accordingly, it is unclear how Wells Fargo arrived at the amount of $809,275.00, but, in any event, Wells Fargo subsequently reduced the amount claimed to $705,428.00.

6

Fargo in United States District Court for the Northern District of Florida for a collective amount of $705,528.00, Wells Fargo made demand on Hardi to satisfy that portion of the dealer's indebtedness to Wells Fargo secured by two of the three sprayers financed by Wells Fargo as follows: sprayer number (6100) and sprayer number (5543), in the respective invoice amounts of $323,796.00 and $177,000.00.

According to Hardi, it satisfied the Wells Fargo indebtedness related to these two sprayers, for the benefit of the dealer, and took, in exchange, an assignment of Wells Fargo's rights under the Inventory Financing Agreement. Doc. #89 at 4.

Though the details of how remain unclear, it appears that at least by the time Hardi filed the instant motion for summary judgment, Hardi had, despite the dealer's "purported" December 2017 sale of sprayer (6100) to Farm Credit Leasing Corporation, taken possession of the sprayer. Furthermore, although not having sued on the indebtedness in the complaint, —presumably, because, at that time, no indebtedness was owed from the dealer to Hardi regarding (6100)—Hardi now seeks summary judgment against the dealer, pursuant to its rights as assignee of Wells Fargo.

Specifically, Hardi asserts that it is entitled to a judgment against the debtor regarding sprayer (6100) in the principal amount of $323,796.00, together with interest in the amount of $6,529.00, alleged to have accrued as of August 31, 2018.

According to Hardi interest began accruing at eight percent (8%) per annum on or about May 31, 2018, when Hardi satisfied the indebtedness owed to Wells Fargo and took the assignment of its rights. Doc. #59-1 at 12.

Defendants argue that according to that because the dealer has already made this tractor available for pickup by Hardi, and pursuant to the relevant buyback laws, the dealer is entitled to a credit or setoff.

Considering the record on the whole, the court is of the opinion that summary judgment arising from the indebtedness related to this sprayer would be premature at this juncture as a genuine dispute of material fact remains as to whether this sprayer was, in fact, sold out of trust by the dealer. Though some evidence of the same exists, according to Hardi, what might otherwise appear to constitute a sale to Farm Credit Leasing Corporation, is merely a "purported sale."

If, in fact, no such out-of-trust sale occurred, it would appear that the dealer would be entitled to a setoff or credit against the amount owed Hardi on the invoice, provided the mere fact of fifty-four (54) usage hours on the reportedly undamaged sprayer does not disqualify it for repurchase.

On the other hand, were it clear that the dealer sold the sprayer out of trust, nothing in the dealer buyback protections afforded by Miss. Code. Ann. § 75-77-3 et seq. would apply to the dealer because, among other reasons, by definition, the buyback statutes require repurchase only of equipment held in a dealer's inventory for sale when the dealership agreement is terminated.

Furthermore, the rate at which Hardi has calculated interest for this indebtedness may be in error since Hardi's right to interest thereon would appear to be governed by the Well Fargo Inventory Financing Agreement, and related transaction statement, assumed by Hardi. It is unclear interest was calculated accordingly.

*Sprayer Number 4627*

As noted, prior to execution of the subject Dealer Agreement, Hardi and the dealer had an existing business relationship and, pursuant to it, on August 31, 2016, Hardi invoiced the dealer for the purchase price, $250,000.00, for sprayer (4627), invoice number 69828, no copy of which was provided by Hardi in connection with the instant motion. Thereafter, Hardi cancelled or satisfied the indebtedness owing under this invoice and reissued an invoice to the dealer for sprayer

8

(4627), having invoice number 79459 and dated June 14, 2017. Doc. #58-1 at 14. According to the invoice, it is due and payable after August 1, 2017, with interest accruing after the due date at one and one-half percent (1.5%) per month. *Id.* This sprayer was apparently not thereafter sold by the dealer, nor was it financed by Wells Fargo. It appears to have remained in the dealer's inventory as of February 2018, when the Hardi Dealer Agreement was, by agreement, terminated as referenced in a letter from Hardi's counsel to the dealer, dated March 21, 2018. Doc. #1-4 at 1-2.

Notably, according to a letter dated September 18, 2018, Hardi's counsel advised, in relevant part, "please take notice that Hardi… as the holder itself of a security interest in the collateral pursuant to that certain Dealer Agreement and security agreement dated May 31, 2017… has taken possession of serial number #4627… The collateral will be sold at private sale after September 30, 2018.…" Doc. #75-2 at 1-2.

Despite this representation, Hardi's counsel, in support of its motion for summary judgment, now maintains "Hardi is not claiming, and has not claimed, to exercise its rights as a secured creditor." Doc. #82 at 3. Further, Hardi represents that despite the reference to the private sale of the collateral, no such sale has occurred. Doc. #89 at 4. According to Hardi, though this sprayer is not alleged to have been sold by the dealer, it currently has 447 usage hours on it and has sustained, what is asserted by Hardi's counsel to amount to, "extensive damage." Doc. #89 at 3. The dealer has, in response, provided no affidavit in contravention of these assertions, but only a joinder in the response filed by Charlotte Schindler, which, in relevant part, only contains rhetorical questions posed by counsel such as:

> By admission, both of these pieces [#4627 and #5543] were picked up from Delta Chemical's office rather than from a customer having already purchased them. This begs the question: Did Hardi deliver these pieces to Delta Chemical in this condition? How can the hours of use and condition otherwise be explained? Hardi has not explained its efforts to resell these units. The Affidavit of Bernard Davis does not explain these factual issues.

9

Doc. #90 at 2.

Hardi seeks a judgment in the principal amount of $238,750.00 (reflecting credit for two payments received from the dealer for the sprayer in 2017), plus interest in the amount of $46,556.25 as of August 31, 2018 and the amount of interest continuing to accrue at one and one-half percent (1.5%) of the past due balance, daily— or $119.37 per day.

Summary judgment arising from the indebtedness related to this sprayer would be premature at this juncture as there is a genuine despite of material fact as to whether, pursuant to Miss. Code Ann.75-77-1 et seq. and the Dealer Agreement, the dealer is entitled to a setoff or credit against any amount owed for purchase of this sprayer. Hardi contends that no repurchase obligation exists because there is extensive damage to the sprayer and 447 usage hours on it.

Whether the hours were incurred by demonstration or lease, or otherwise, has not been established and, although Hardi's counsel characterizes the sprayer as having extensive damage, it is not clear that the reported maintenance and repair-type items are considered such in the industry. It also remains unclear whether this sprayer is subject to repurchase at an agreed depreciated value pursuant to Miss. Code Ann. §75-77-5.

*Sprayer Number 5543*

On May 19, 2017, Hardi invoiced the dealer for sprayer number (5543) in the amount of $177,000.00.[7] However, on June 13, 2017, Hardi cancelled or satisfied the $177,000.00 indebtedness and on the following day reissued another invoice for that amount with "original" payment terms. On July 21, 2017, Wells Fargo, for the benefit of the dealer and pursuant to its Inventory Financing Agreement, paid off the $177,000.00 indebtedness owed by the dealer to Hardi. According to the Wells Fargo transaction statement evidencing the same, the dealer has a

---

[7] No copy of that invoice was provided to the court.

"Free Period"[8] until March 10, 2018, yet the same transaction statement reflects "CHARGES BEGIN DATE: 06/14/17" at the rates described in the Wells Fargo invoice to the dealer. Doc. #64-3 at 20.

This sprayer was apparently never sold out of trust and has remained in the dealer's inventory as of February 2018, when the Wells Fargo Inventory Financing Agreement and the Hardi Dealer Agreement were terminated, as described above.

According to Hardi, this sprayer was subject to the same guarantee of payment by Hardi to Wells Fargo as sprayer number (6100), discussed above, which indebtedness Hardi has, since the instant lawsuit was filed, now satisfied in exchange for an assignment of Wells Fargo's rights pursuant to the Inventory Financing Agreement. A supplemental affidavit recently submitted on behalf of Hardi asserts that this sprayer was returned to Hardi in new and saleable condition. As discussed above relative to (4627), this sprayer too was included in counsel for Hardi's September 18, 2018 letter, wherein Hardi represented that, as a creditor of the dealer, it had taken possession of the of the subject sprayer and intended to sell it at private sale after September 30, 2018. Doc. #89-1 at 2. Yet, again, as noted above, Hardi's counsel now represents to the court that it has never acted against the sprayers in the capacity of a secured creditor. Doc. #82 at 3.

Hardi asserts, by way of its motion for summary judgment, that it is entitled to a judgment for the principal sum of $177,000.00, with interest through August 31, 2018 in the amount of $3,569.00, and thereafter at the rate of one and a half percent (1.5%) per month. The dealer contends that it is entitled to a setoff or credit against the amount owed to Hardi because the sprayer is new and saleable condition.

---

[8] Free period (FFP) is defined at the bottom of the page as "Free Floor Period." Doc. # 75-3 at 19.

Summary judgment arising from the indebtedness related to this sprayer in the amount claimed would be improper, as the sprayer is apparently still in new and salable condition, thus entitling the dealer to a setoff or credit pursuant to the dealer agreement and buy back statues.

Further, it is unclear whether Miss. Code. Ann. § 75-77-11 has application here or with respect to any other sprayer(s).

It is also unclear how the interest claimed by Hardi was calculated. Presumably, it should have been calculated pursuant to the Wells Fargo transaction statement, rather than a Hardi invoice. Finally, to the extent the indebtedness owed to Hardi for this sprayer, if any, was reduced, or should have been reduced, under the repurchase obligations set forth in the Dealer Agreement and Miss. Code. Ann. § 75-77-3 et seq, interest would not have continued thereafter to accrue on the original principal indebtedness.

*Sprayer Number 5533*

On January 26, 2018, Hardi invoiced the dealer for sprayer serial number (5533) in the amount of $267,449.00, payable, unless sooner sold, two hundred and seventy (270) days from the date of the invoice, with interest thereafter to accrue at one and one-half percent (1.5%) per month. As earlier noted, Hardi and the dealer agreed to a termination of the Dealer Agreement sometime, it appears, in February 2018, and Hardi took possession of this sprayer from the dealer at some point thereafter.

According to Hardi, this sprayer had earlier been invoiced to the dealer by Hardi and sold by the dealer (apparently within trust) to a third party, a Mr. Meyers. Thereafter, warranty issues apparently arose, and Hardi agreed to repurchase the sprayer and re-invoice it to the dealer in January 2018. No agreements evidencing this arrangement were provided in connection with the motion for summary judgment, and although Hardi has provided an account history allegedly

12

covering all transactions it has had with the dealer, the court cannot ascertain where and when the earlier transaction between Hardi and the dealer occurred. At any rate, when Hardi picked the sprayer up from the dealer, following termination of the to the Dealer Agreement, it reportedly had 196 usage hours on it. Doc. 89-1.

As was the case with sprayers (4627) and (5543), this sprayer was also the subject of party's counsel's letter of September 18, 2018 indicating that Hardi was exercising its rights to the collateral and would sell it after at private sale after September 30, 2018. Yet, as noted, despite these assertions Hardi's counsel now contends that it has never undertaken to exercise its rights to the collateral. Further, according to Hardi, it owes the dealer no obligation to repurchase this sprayer pursuant to the Dealer Agreement or Miss. Code. Ann. § 75-77-1 et seq. because it is not undamaged, and it has 196 usage hours on it.

The dealer relies for its part on the same set of rhetorical questions, as quoted above concerning sprayer (4627).

Again, summary judgment arising from the indebtedness related to this sprayer would be premature at this juncture as a genuine dispute of material fact exists as to the amount owed. For example, under Miss. Code. Ann. § 75-77-5, it appears that un-abused equipment used for demonstration purposes or lease is subject to repurchase even if for only an agreed depreciated value. In other circumstances, such as those set out in Miss. Code. Ann. § 75-77-11, the repurchase is 100% of the current net price. Also, this sprayer could not have begun to accrue interest until—at the earliest—February or March 2018 when the Dealer Agreement was terminated. And, if the seller was obligated to repurchase this sprayer for any amount prior to August 31, 2018, interest on the total principal amount could not have continued thereafter to accrue.

*Sprayer Number 4566*

On June 22, 2017, Hardi invoiced the dealer, invoice number 79949, in the amount of $164,880.00, for sprayer number (5566).[9] However, on August 24, 2017, the $164,880.00 indebtedness was cancelled or satisfied by Hardi and a new invoice was issued in the amount of $164,880.00, invoice number 83402. This invoice reflects a purchase price of $206,100.25, less a 20% trade discount of $41,220.05, for a net amount due of $164, 880.00, payable two hundred and ten (210) days from the date of invoice. Unbeknownst to Hardi, in February of 2018, the dealer sold this sprayer, out of trust, to a third party (apparently a Mr. Branch) on February 2, 2018 for the purchase price of $216,000.00, plus a "a New Holland Sprayer 2016." Doc. #1-4 at 5.

Though the details remain unclear, Hardi has apparently regained, at least, possession of this sprayer. Hardi contends that it is owed the purchase price of this sprayer in the following amounts: $164,880.00, plus interest as of August 31, 2018 in the amount of $13,084.04. In response, the dealer asserts a need for more information about the terms on which Hardi has regained possession of the sprayer before a summary judgment for the indebtedness owed on account of its out-of-trust sale by the dealer may be entered.

The dealer is mistaken. When the dealer sold this sprayer out of trust and failed to remit payment for the same to Hardi, the invoice became immediately due and payable, and the dealer has no right to setoff or credit for repurchase of this sprayer, as it had already sold the sprayer when the dealership agreement was terminated. In short, the statutory buyback provisions were not intended to protect a dealer who sells collateral out of trust and pockets the proceeds. Any suggestion to the contrary is uncolorable. Hardi is entitled, at this time, to a partial summary judgment in the amount of $164,880.00, plus interest, as of August 31, 2018, in the amount of

---

[9] No copy of this invoice was provided to the court.

$13,084.00 and continuing to accrue thru the date hereof in the additional amount of $10,387.44 ($164,880 x.015 /30 x126), as well as post judgment interest at the legal rate. Reasonably incurred attorney fees will be accessed in accordance with the provisions of Fed. R. Civ. P. 54.

*Sprayer Number 4164*

This sprayer was sold by Hardi to the dealer but financed by Wells Fargo. It is now undisputed that Hardi is currently owed nothing for the purchase of this sprayer as the indebtedness, if any, is owed to Wells Fargo. Accordingly, summary judgement related thereto is hereby denied.

**SO ORDERED** this 3rd day of January, 2019.

/s/ Jane M. Virden
**UNITED STATES MAGISTRATE JUDGE**